Michael BROOKS, Appellant,

v.

STATE of Indiana, Appellee.

No. 478S78.

Supreme Court of Indiana.

May 7, 1982.

David F. McNamar, Michael R. Frances-
chini, Steers, Sullivan, McNamar & Rogers,
Indianapolis, for appellant.

Theodore L. Sendak, Atty. Gen., Alem-
bert W. Brayton, Deputy Atty. Gen., Indi-
anapolis, for appellee.

PIVARNIK, Justice.

Michael Brooks, defendant-appellant, was
found guilty by a jury of Second-Degree
Murder, Ind.Code § 35–1–54–1 (Burns 1975)
[repealed by Acts 1976, P.L. 148, § 24] in
Marion County Criminal Court on Novem-
ber 15, 1977. He was sentenced to a term
of imprisonment of not less than fifteen
(15) nor more than twenty-five (25) years.
Brooks appeals.

Three errors are asserted by defendant,
concerning: 1) whether there was sufficient
evidence upon which to base a murder con-
viction; 2) whether the trial court erred in
making defendant sit through jury selection
while wearing jail clothing; and 3) whether
the trial court erred in giving the jury an
instruction after it returned an improper
verdict.

The evidence most favorable to the State
reveals that on the evening of June 3, 1977,
the decedent, Raymond Vaughn, and the
defendant were drinking at the Shalimar
Club, 22nd and Central, in Indianapolis, In-
diana. Vaughn became abusive and argu-
mentative to the employees of the club so
defendant volunteered to take his friend
outside. While outside, the two men began
to fight in the rear parking lot. Brooks
killed Vaughn by stabbing and cutting him
a total of eighteen (18) times. Defendant
fled to his apartment house but was ap-
prehended later that day.

I.

The first issue for our consideration con-
cerns the sufficiency of the evidence. De-
fendant argues that the State did not meet
its burden to show that he did not act in
self-defense. Under Ind.Code § 35–41–3–2
(Burns 1979):

"[A] person is justified in using deadly
force only if he reasonably believes that
that force is necessary to prevent serious
bodily injury to himself or a third person
or the commission of a forcible felony."

On the other hand, Ind.Code § 35–1–54–1,
the effective statute at that time, lists the
necessary elements for a finding of second-

degree murder: "Whoever, purposely and maliciously, kills any human being, is guilty of murder in the second degree, . . . ."

■ In examining a claim of insufficient evidence, this Court will neither reweigh the evidence nor judge the credibility of witnesses. To do so would usurp the jury's functions. We will determine only whether there is substantial evidence of probative value from which the jury could reasonably find the defendant guilty beyond a reasonable doubt. *Sanders v. State*, (1981) Ind., 428 N.E.2d 23, 25; *Love v. State*, (1979) Ind., 393 N.E.2d 178, 180; *Pollard v. State*, (1979) Ind., 388 N.E.2d 496, 501.

■ The requirements for self-defense are that the defendant acted without fault; that the defendant was in a place where he had a right to be; and that the defendant was in real danger of death or great bodily harm, or in such apparent danger as caused him in good faith to fear death or great bodily harm. *Jackson v. State*, (1978) 267 Ind. 501, 503, 371 N.E.2d 698, 699; *Franklin v. State*, (1977) 266 Ind. 540, 544, 364 N.E.2d 1019, 1021; *King v. State*, (1968) 249 Ind. 699, 705, 234 N.E.2d 465, 468.

In the case before us there were no eye-witnesses to the homicide but many people were present at the events leading up to the murder and defendant himself admits killing Vaughn. Defendant Brooks and Vaughn had been friends for several months and were characterized as "drinking buddies." On the afternoon and evening of June 3, 1977, they were together, drinking heavily. Charles Scott went to the Shalimar Club between 8 and 9 p. m., on June 3, with his friend, Claude Bolin. Scott saw defendant and Vaughn with a group of other people in the parking lot, and later saw the two men in the Club drinking and talking together. Both defendant and Vaughn had knives in their hands. Vaughn's knife was a four-to-six inch pocket knife and defendant's knife looked like a pen knife with a very small blade. Neither was attempting to stab the other, they were just "horsing around." Scott said this was not an unusual occurrence in the Shalimar Club parking lot. He said neither of them

seemed to be angry but both were very drunk. When Scott saw them inside, he said they were so drunk that neither could walk. Scott and other witnesses testified that the decedent had a reputation for getting a little high and pulling out his knife; further, he did not have a reputation in the community as a peaceful person.

While Scott said both men were very drunk, there was also testimony that indicated the defendant was not as drunk as the decedent and appeared to be more self-composed than the decedent throughout the afternoon and evening. Defendant's wife, Rachel Brooks, testified that when she saw the two men earlier in the day, the deceased was drinking heavily but her husband was not drinking at that time, or at least did not look as if he had been. Vaughn was very drunk and unruly at the Club and the defendant was self-composed to the extent that he was enlisted and later volunteered to remove Vaughn from the premises. Throughout the evening Vaughn was bothering several people. He had a confrontation with Davis, a waiter, and at one time, Vaughn threatened to kill Davis. Davis and the owner of the Shalimar Club then asked a security guard, Julian Morton, to remove Vaughn. Morton escorted Vaughn outside on two different occasions but Vaughn returned each time. Defendant Brooks then stated that he would see that Vaughn left the Club and escorted him outside. Brooks returned to the bar sometime between 12:30 and 1:00 a. m., and bought a bottle of alcohol. He stated that he had taken care of his friend. Around 3:00 a. m., when Morton was closing the Club, one of the customers returned and showed Morton the body of Raymond Vaughn lying in the parking lot at the rear of the bar. There were eighteen stab wounds on Vaughn, five of which went through the left side of the chest into the lung. One of these went into the abdomen and into the liver. There were also stab wounds on the right side and there were three cuts on the body, one of which extended across the front of the neck and had the effect of cutting Vaughn's throat clear through from one end to the

other. Dr. James Benz testified that this cut through the throat could have been done from the front or rear but it was characteristic of the assailant standing behind the victim and drawing the knife across his neck. Any one of several of the stabbing or cut wounds was fatal to the victim.

Defendant testified in his own behalf. He stated that Vaughn became angry in the parking lot because he wanted to return and get the security officer. Vaughn swung and hit defendant in the head. With a knife in his hand, Vaughn started coming at the defendant but defendant somehow managed to get the knife away from Vaughn. Defendant began hitting, with the knife in his hand, to protect himself. Defendant said he did not realize he was stabbing Vaughn until he saw blood and then he became afraid and left the scene. He tried to wipe the blood off himself and the knife with a towel; later, he threw the knife and towel into the trash can at the entrance of the building in which he lived.

 From this evidence the jury could have found that after disarming Vaughn and then having possession of Vaughn's knife as well as his own knife, and further considering the drunken condition of Vaughn, defendant could have withdrawn without any harm to himself. He therefore could not have been in a position to feel that it was necessary for him to continue attacking Vaughn in order to defend himself. This is significant in view of the fact that eighteen blows were struck upon Vaughn's body, many of which would have been fatal alone. Several of the wounds penetrated the lungs and other organs and the one to the neck was characteristic of one dealt by standing behind the victim. Defendant Brooks then fled the scene and tried to dispose of the blood on the knife and on himself and on his clothing. Defendant claims that the jury must look at the issue of self-defense from the defendant's viewpoint and the appraisal of fear and danger that he had at the time of the encounter. Defendant's assertion is, of course, correct, but as the State properly

points out, the jury was not required to believe defendant's testimony and his version of the incident, but had sufficient evidence before it to find that such was not the case. *Williams v. State*, (1974) 262 Ind. 382, 384, 316 N.E.2d 354, 355. Since there was ample evidence for the jury to find as it did on this issue, the question of fact was one for the jury and not one we would preempt on appeal. *Hester v. State*, (1978) 267 Ind. 697, 373 N.E.2d 141. There was also ample evidence shown above for the jury to find that the defendant had used a deadly weapon against an unarmed person in a manner likely to produce death and therefore sufficient for the jury to conclude that malice existed. *McFarland v. State*, (1979) Ind., 390 N.E.2d 989.

II.

It is defendant's contention that during the voir dire of the jury, defendant was clothed in jail clothing and states there was a large "J" on the back of the jacket. There is nothing in the record to show that this is, in fact, true, or that any reference was made to the clothing worn by the defendant at any time during the trial. Defendant contends that this clothing was worn by him during the voir dire but that during the rest of the trial the defendant wore street clothing. The first reference to this issue is made in defendant's Motion to correct errors but neither there nor in this appeal does he allege or show that he objected to wearing the jail clothing during the voir dire examination, nor is there any showing that he was forced to wear them by the court or anyone else.

 Defendant did not object to wearing this clothing before or during the voir dire examination nor before or during the trial. The United States Supreme Court set the standard on this issue in *Estelle v. Williams*, (1976) 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126, wherein it said: "Nothing in this record, therefore, warrants a conclusion that respondent was compelled to stand trial in jail garb or that there was sufficient reason to excuse the failure to raise the issue before trial." 425 U.S. at 512, 96 S.Ct.

at 1697, 48 L.Ed.2d at 135. This Court then stated in *Smith v. State*, (1977) 267 Ind. 167, at 172, 368 N.E.2d 1154 at 1157:

"The court in *Williams, supra,* was chiefly concerned with the element of compulsion, noting that under some circumstances a defendant might make the tactical decision to appear in prison garb with the hope of eliciting the jury's sympathy. Accordingly, the court held that proper objection by defendant is necessary to establish a constitutional violation."

*Smith* also held that it is not only necessary that the defendant was dressed in prison or jail clothing, but there also needs to be a showing that such clothing was identifiable as such to the extent that it was apparent to the jury that it was prison or jail clothing. The only statement defendant makes here that is not supported by the record in any manner is that there was a "J" on the back of defendant's clothing. Appellant has accordingly waived any error there might be in this issue. Rule A.P. 8.3(A)(7); *Anderson v. State*, (1977) 267 Ind. 289, 370 N.E.2d 318.

### III.

The record shows that after the jury had been read instructions and retired to deliberate, they returned in open court with a question regarding the instructions. The court then re-read all of the instructions to the jury and directed that they return to the jury room to continue their deliberations. The jury then returned with the following verdict:

"We the jury find the defendant, Michael Brooks, guilty of second degree murder and that he be imprisoned for fifteen (15) years. Signed: William M. Stevens, Foreman."

The court examined the jury with counsel present and indicated that the verdict was incorrect in that the alternative sentence of second degree murder is either life or an indeterminate term of not less than fifteen nor more than twenty-five years. He found that the fifteen year determinate sentence did not comply with the statute and was apparently a misunderstanding of the jury. He then indicated to counsel that he was going to send the jury back to correct their verdict by making it not less than fifteen nor more than twenty-five years. No objection was made by counsel until after the jury had retired and then counsel objected and requested that all instructions be re-read to the jurors and that they be allowed to deliberate further on a verdict. It seems to be defendant's contention that the verdict brought in by the jurors was contradictory and that the court had no right to infer to them that he approved of the finding of guilty of second degree murder but did not approve of the penalty they fixed for that crime. We think the court acted properly here. It is clear the jury intended to find and did find the defendant guilty of second degree murder. The State's position is well taken that it is clear the jury also wished to assess the minimum allowable punishment for that offense and apparently thought they could give a determinate sentence of from fifteen to twenty-five years and therefore gave the fifteen year figure. This Court was faced with the same situation in *Kirkland v. State*, (1955) 235 Ind. 450, 134 N.E.2d 223: "It is the settled law that it is the duty of the trial court before discharging a jury to examine the verdict and if found to be irregular, to instruct the jury further as to the proper form of verdict. *Moore v. State*, (1947) 225 Ind. 357, 75 N.E.2d 193; *Limeberry v. State*, (1945) 223 Ind. 622, 63 N.E.2d 697."

The court properly ordered the jury to correct its verdict to reflect the proper penalty fixed for the crime of which it had found the defendant guilty.

The trial court is in all things affirmed.

GIVAN, C. J., and DeBRULER, HUNTER and PRENTICE, JJ., concur.